## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **ELDRICO DERRICO,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:09-CV-03138-AJB** |
| | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY,** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER AND OPINION[1]

Plaintiff Eldrico Derrico ("Plaintiff") brought this action pursuant to sections

205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to

obtain judicial review of the final decision of the Commissioner of the Social Security

Administration ("the Commissioner") denying his applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social

Security Act ("the Act").[2]  For the reasons stated below, the undersigned **REVERSES**

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [*See* Dkt. Entry dated 12/11/2009].  Therefore, this Order constitutes a final Order of the Court.

[2]     Title II of the Social Security Act provides for federal disability insurance benefits.  42 U.S.C. § 401 *et seq.*  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for supplemental security income benefits for the disabled.  Title XVI claims are not tied to the attainment of a particular period of

the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.   PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on June 19, 2007, alleging disability commencing on June 19, 2007. [Record (hereinafter "R") 13].[3] Plaintiff's applications were denied initially and on reconsideration. [*See* R63, 67, 74, 78]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). [R82]. An evidentiary hearing was held on March 10, 2009. [R13, 90]. The ALJ issued a decision on April 2, 2009, denying Plaintiff's applications on the ground that he had not been under a "disability" at any time through the date of the decision. [R21]. Plaintiff

---

insurance disability. *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)). Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI. In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI. However, different statutes and regulations apply to each type of claim. Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

[3]     The Court is unable to find these applications in the case record, so the Court relies on the Administrative Law Judge's opinion.

sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on September 10, 2009, making the ALJ's decision the final decision of the Commissioner.  [R1].

Plaintiff then filed an action in this Court on October 28, 2009, seeking review of the Commissioner's decision. *Derrico v. Comm'r of Soc. Sec*, Civil Action File No. 1:09-cv-03138.  [*See* Doc. 2].  The answer and transcript were filed on March 9, 2010, [*see* Docs. 7-8], and the Court heard oral arguments, [*see* Doc. 14].  The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    STATEMENT OF FACTS

### A.    *Background*

Plaintiff was born on June 4, 1964, and was 44-years-old at the time of the hearing before the ALJ.  [R28].  Plaintiff has received his GED.  [R40].  He alleges disability beginning on June 19, 2007, due to a stroke.  [*See* Doc. 11 at 4-5].

B.      *Medical Records* (R245-505)

In June 2003, Barry Fioranelli, M.D., treated Plaintiff for stomach pain, and Plaintiff was prescribed Nexium.[4]  [R255-56, 397-98].  In April 2007, Plaintiff saw a Dr. Henderson, M.D., for body aches, chills, fever, and sore throat.  [R271-72, R413-14].  No prescriptions were listed.  [R272, 414].

Most relevant to this case, on June 12, 2007, Plaintiff was admitted to a hospital in the Grady Health System for an acute ischemic stroke[5] and hypercholesterolemia.[6]  [R283].  A neurological exam indicated that he "was alert and oriented times three with very mild dysarthria."[7]  [R284].  Upon discharge on June 14, 2007, he was prescribed

---

[4]      Nexium (esomeprazole) is used to treat gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and possible injury to the esophagus (the tube between the throat and stomach).   MedlinePlus, Esomeprazole, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699054.html (last visited 03/10/11).

[5]      An ischemic stroke occurs when a blood vessel that supplies blood to the brain is blocked by a blood clot.  MedlinePlus, Stroke, http://www.nlm.nih.gov/medlineplus/ency/article/000726.htm (last visited 03/10/11).

[6]      Hypercholesterolemia is an alternate name for lipid disorder, or high blood cholesterol and triglycerides.  *See* MedlinePlus, High blood cholesterol and triglycerides, http://www.nlm.nih.gov/medlineplus/ency/article/000403.htm (last visited 03/10/11).

[7]      Dysarthria is a condition that occurs when problems with the muscles that help you talk make it difficult to pronounce words.  MedlinePlus, Dysarthria,

4

aspirin, Zocor,[8] and a multivitamin.  [R285].  A few days later, on June 17, 2007,

Plaintiff had a routine check-up with Dr. Fioranelli, complained of depression, and was

prescribed albuterol[9], Zoloft,[10] ECASA,[11] and simvastatin (Zocor).  [R269-70].

---

http://www.nlm.nih.gov/medlineplus/ency/article/007470.htm (last visited 03/10/11).

[8]    Zocor (simvastatin) is used "together with lifestyle changes (diet, weight-loss, exercise) to reduce the amount of fatty substances such as low-density lipoprotein (LDL) cholesterol ('bad cholesterol') and triglycerides in the blood and to increase the amount of high-density lipoprotein (HDL) cholesterol (good cholesterol) in the blood."  MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html (last visited 03/10/11).

[9]    Albuterol is used to prevent and treat wheezing, difficulty breathing, and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease.  MedlinePlus, Albuterol Inhalation, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682145.html (last visited 03/10/11).

[10]    Zoloft (sertraline) is used to treat depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder, and social anxiety disorder.  *See* MedlinePlus, Sertraline, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited 03/10/11).

[11]    ECASA means Enteric-coated acetylsalicylic acid.  The Free Online Medical Dictionary, http://acronyms.thefreedictionary.com/ecasa (last visited 03/10/11).  Acetylsalicylic acid is aspirin.  *See* MedlinePlus, Aspirin, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682878.html (last visited 03/10/11).

5

On August 11, 2007, Dr. Yancey at Grady noted a drug overdose (Plaintiff had ingested 5-6 tabs of Zoloft, although he denied suicidal ideation, [R296]) and depression.   [R295].   On August 12, 2007, Dr. Pratt at Grady conducted a comprehensive psychiatric assessment, noting that Plaintiff complained of depression, alcohol abuse (relapsing "on 6/07" after 2 ½ years of sobriety), and decreased sleep. [R291-93].  Plaintiff was prescribed Celexa[12] and trazodone.[13] [R293].  At an August 17, 2007, check-up, Dr. Fioranelli noted depression, heightened stress, decreased sleep, increased blood pressure, asthma, and the August 10, 2007, alleged suicide attempt, as well as prescriptions for Celexa, trazodone, aspirin, and albuterol, with an indication to discontinue Zoloft.  [R267-68, 409-10].  On August 31, 2007, Dr. Fioranelli completed a "Mental Impairment Questionnaire" on behalf of the state agency, indicating that: (1) Plaintiff had a history of stroke, weakness on the left side, hypertension, and asthma, suffered from "recent" depression, and was hospitalized on

---

[12]    Celexa (citalopram) is a selective serotonin reuptake inhibitor (SSRI) used to treat depression. *See* MedlinePlus, Citalopram, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last visited 03/10/11).

[13]    Trazodone is a serotonin modulator used to depression. *See* MedlinePlus, Trazodone,  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited 03/10/11).

6

August 10, 2007, for a suicide attempt; (2) Plaintiff had a depressed affect and mood, brought on by recent stress; (3) Plaintiff was not currently suicidal; (4) Plaintiff's "content of thought" was abnormal, but his orientation, appearance, general behavior, recent and remote memory, and impulse control were normal; (5) Plaintiff's ability to understand and carry out simple instructions, and his ability to get along with the public, supervisors, and coworkers, were normal; and (6) Plaintiff was "somewhat likely" to decompensate under stress.  [R275-77].

On September 17, 2007, Chadwick Hales, M.D./Ph.D., completed a neurological questionnaire on behalf of the state agency, noting: (1) Plaintiff had mild weakness on the left side in the lower extremities; (2) Plaintiff had a slight decrease in finger movement and coordination in the left hand and arm; (3) "Patient is able to ambulate for activities of daily living"; (4) Plaintiff "is able to ambulate with and without [his] cane, however his mobility without the cane is limited by unsteadiness in gait that may lead to falls."; and (5) Plaintiff did not have aphasia.[14]  [R299-301].  Treatment notes signed by Dr. Hales and dated that same day, although almost entirely illegible, indicate

---

[14]     Aphasia is a disorder caused by damage to the parts of the brain that control language; it can make it hard for to read, write, and say what one means to say. *See* MedlinePlus, Aphasia  http://www.nlm.nih.gov/medlineplus/aphasia.html (last visited 03/10/11).

AO 72A
(Rev.8/8
2)

severe depression as part of the assessment and listed Zoloft, Celexa, and trazodone as current medications.  [R287].

On October 9, 2007, Russell Wallace, M.D., completed a physical residual functional capacity ("RFC") assessment, [R302-09], and: (1) noted Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; could stand, sit, or walk for six hours per eight-hour work day; was limited in pushing and pulling in the lower extremities due to unsteadiness; could frequently climb, stoop, kneel, crouch, and crawl, and occasionally balance and stoop; and had no manipulative, communicative, environmental, or visual limitations,  [R303-06]; (2) found Plaintiff to be credible, [R307 ("PER AVAILABLE MER CL IS CREDIBLE")]; and (3) indicated that there were no treating or examining source statements regarding Plaintiff's physical capabilities in the file, [R308].

On October 29, 2007, W. Brenard Francis, Ph.D., completed a psychological evaluation on a referral from the state agency to assess psychological conditions related to "complications from stroke."  [R311-16].  Plaintiff reported feelings of sadness, frequent crying, insomnia, decreased ability to concentrate and make decisions, and suicidal ideation.  [R313].  He also reported panic attacks, and he said that he would become disoriented at the grocery store and could not perform household chores

AO 72A
(Rev.8/8
2)

because he could not remember what he was supposed to do. [R313]. Plaintiff's mother reported a family history of depression and stated that Plaintiff forgot everything, that he did not think the way he previously did, and that he could not stand to be around a lot of people without becoming afraid. [R314]. At the time of the evaluation, Plaintiff was taking simvastatin, trazodone, citalopram (Celexa), loratadine,[15] albuterol, and aspirin. [R314]. Regarding testing results, Dr. Francis stated that Plaintiff "applied good effort and task persistence with adequate concentration" and that he was not currently suffering from impairment in visual-motor perception. [R315]. For intellectual functioning, Plaintiff's reading was at a high-school level, spelling was at a fifth-grade level, and math was at a fourth-grade level. [R315]. His performance IQ was 69, with a full scale IQ of 75. [R315]. Dr. Francis's diagnostic impressions were "Anxiety Disorder Not Otherwise Specified," "Adjustment Disorder with Depressed Mood," "Alcohol Abuse," "Borderline Intellectual Functioning," and "Complications from stroke, hypertension, high cholesterol (per claimant/collateral report)." [R316]. Dr. Francis stated that: (1) Plaintiff had the ability

---

[15]    Claritin (loratidine) is used "to temporarily relieve the symptoms of hay fever (allergy to pollen, dust, or other substances in the air) and other allergies. These symptoms include sneezing, runny nose, and itchy eyes, nose, or throat." MedlinePlus, Loratidine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697038.html (last visited 03/10/11).

AO 72A
(Rev.8/8
2)

to understand and remember simple instructions; (2) Plaintiff might not be able to reliably and consistently carry out simple instructions; (3) Plaintiff's concentration was adequate for some basic work-related functions; and (4) Plaintiff might have difficulty adhering to typical work schedule and maintaining an adequate pace in a work setting, but could likely work in a structured environment.  [R316].

On November 6, 2007, Linda O'Neil, Ph.D., conducted a mental RFC assessment.  [R 317-20].  She reported that Plaintiff was moderately limited in the ability to: (1)  understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3)  perform activities according to a schedule, maintain regular attendance, and be punctual; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms; (5) perform at a consistent pace without an unreasonable number and length of rest periods; (6) respond appropriately to changes in the work setting; and (7) be aware of normal hazards and take appropriate procedures.  [R317-18].  That same day, she also completed a psychiatric review technique form ("PRTF").  [R321-34].  On that form, Dr. O'Neil noted medically determinable impairments that included: (1) "BIF [borderline intellectual functioning]; likely cognitive decline due to stroke"; (2) adjustment disorder with depressed mood; and (3) "anxiety nos [not otherwise

specified]." [R322, 324, 326]. Regarding functional limitations, Dr. O'Neil noted a moderate limitation regarding activities of daily living, a mild limitation in maintaining social functioning, and a moderate limitation in maintaining concentration, persistence, or pace. [R331]. There were no episodes of decompensation. [R331]. An addendum to the PRTF, dated December 4, 2007, noted additional mental health information that "confirmed continuing issues with anxiety, depression, and a suicidal attempt after wife left him which resulted in a brief (overnight) hospitalization. . . . MRFC stands as written." [R345].

On November 7, 2007, Plaintiff was seen by Renee Dryfoos, LCSW, at the DeKalb Community Service Board ("DCSB"). [R336-44]. Plaintiff's presenting problems were depression, anxiety, and panic. [R336]. Regarding Plaintiff's mental status, Ms. Dryfoos noted a dysphoric mood, blunted affect, insomnia, decreased energy/libido, and impaired short-term memory. [R337]. Ms. Dryfoos also noted Plaintiff's suicide attempt when his wife left in August 2007, [R340], when "he took a 'handful' of Zoloft and drank 4 shots," then went to the emergency room at Grady and stayed overnight. [R338]. On November 19, 2007, notes from a routine check-up

11

with Dr. Fioranelli noted chronic lack of sleep and indicated that Plaintiff was taking Celexa, trazodone, Ambien,[16] albuterol, and aspirin.  [R265-66, 407-08].

On December 13, 2007, Anthony Nealy, M.D., from DCSB saw Plaintiff "for followup and treatment of depressive illness."  [R477].  Dr. Nealy noted that: (1) Plaintiff denied past psychiatric treatment prior to his stroke; (2) Plaintiff "admit[ted] to auditory hallucinations in the past while depressed"; (3) and Plaintiff had "impairment of recent memory, . . . anxious and depressed [mood], sleep and appetite disturbance, difficulty concentrating, feelings of helplessness and hopelessness." [R477].  Plaintiff was diagnosed with "hypercholesterolosis," asthma, and "Depressive Disorder, NOS."  [R477].  For a January 14, 2008, visit, Dr. Nealy noted that Plaintiff had trouble sleeping since the trazodone was discontinued but that he was otherwise doing well.  [R479].  Plaintiff was continuing to have intermittent auditory hallucinations, so his Seroquel[17] prescription was increased to 200 mg.  [R479].

---

[16]     Ambien (zolpidem) is a sedative-hypnotic that is used to treat insomnia. *S e e   M e d l i n e P l u s ,   Z o l p i d e m ,* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693025.html  (last  visited 03/10/11).

[17]     Seroquel (quetiapine) is used to treat the symptoms of schizophrenia, mania, and depression.  *S e e*  MedlinePlus,  Quetiapine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html  (last  visited 03/10/11).

On January 16, 2008, Kathi Houman, LPC, saw Plaintiff and wrote: "Thoughts are organized[,] mood is depressed and angry at times about his victimization [regarding his abuse as a child]."  [R478].  A treatment plan listing Dr. Nealy's name and dated February 6, 2008, stated the presenting problem as "[v]ery depressed and had recent stroke difficulty being around others," and recommended monthly physician assessments and individual and group counseling.  [R480-81].  A clinical assessment signed by Ms. Houman and dated February 13, 2008, indicated that: (1) Plaintiff had homicidal and suicidal ideations; (2) when Plaintiff got upset, he wanted to hurt himself or lash out at others, but he would agree to talk to his grandmother to help him through it, or to call a counselor; (3) his thoughts raced when he was upset (but were otherwise organized and clear); (4) he had difficulty focusing at times; and (5) he reported "hearing voices a few days ago to kill Able.  Stays away from him."  [R378-80, 483-85].  Otherwise, Plaintiff's judgment, insight, and cognition were good.  [R380, 485].  Another part of that clinical assessment – presumably performed the same day – identified the chief complaint as "Very depressed and had recent stroke difficulty being around others," and listed the presenting symptoms as "depressed since stroke and feeling depressed and having difficulty sleeping panic attacks around others.  Having difficulty with memory."  [R373].  The medications listed were Seroquel, Celexa,

13

Zocor, aspirin, and Proventil (albuterol).  [R373].  An "outpatient progress note" by Ms. Houman on that same day (February 13, 2008) indicated Plaintiff's depression, that he was easily agitated, that he heard voices, and that he was going to begin an anger management group.  [R486].  Dr. Nealy's notes from that same day stated that Plaintiff continued to experience auditory hallucinations, increased Plaintiff's Seroquel to 400mg, discontinued Plaintiff's Celexa because it made him feel irritable, and prescribed Plaintiff Effexor XR 75mg.[18]  [R487].  Notes from a March 12, 2008, visit with Dr. Nealy indicated a good response to the Effexor and to the increased Seroquel and noted that Plaintiff occasionally heard voices when he was angry.  [R488].

Notes from a visit with Sam Dooley, M.D., apparently from March 14, 2008, indicated that: (1) Plaintiff complained of short-term memory loss; (2) Plaintiff had persistent weakness since his stroke and could not afford physical therapy; and (3) Plaintiff's girlfriend noted Plaintiff's decreased attention span since the stroke, as well as "spasms" at night while Plaintiff was sleeping.  [R261, 403].  Dr. Dooley wrote

---

[18]     Effexor XR (venlafaxine) is an extended-release medication "used to treat generalized anxiety disorder (GAD; excessive worrying that is difficult to control), social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life), and panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks)."  MedlinePlus, Venlafaxine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html  (last visited 03/10/11).

14

"Neuro consult" as part of his plan for that visit, and "Neurology" is listed as a referral. [R262, 404].   Ambien, Seroquel, and Effexor were among the medications listed. [R262, 404].   On March 16, 2008, Dr. Dooley indicated that Plaintiff's asthma was "doing ok," that Plaintiff was "doing well" with respect to his depression, and that Plaintiff had memory loss and a decreased attention span, though there was no evidence of biochemical abnormalities, syphilis, or HIV.  [R258].

On March 28, 2008, Dr. Fioranelli indicated that Plaintiff's body aches were at a pain level of 9/10 (though Plaintiff had not taken any pain medication that day) and that Plaintiff had a cough, a runny nose, and congestion.  [R259, 401].  Dr. Fioranelli's assessment was acute bronchitis allergic rhinitis.[19]  [R260, 402].

On April 9, 2008, Dr. Nealy noted that Plaintiff was not having any auditory hallucinations, that his mood was stable, and that he had a good response to his medication.  [R490].  On May 8, 2008, however, Dr. Nealy noted visual hallucinations, stating that the recent loss of Plaintiff's grandmother was the likely cause.  [R492].

---

[19]    Allergic rhinitis is a collection of symptoms – mostly in the nose and eyes – that occurs when one breathes in something one is allergic to, such as dust, dander, or pollen.  MedlinePlus, Allergic rhinitis, http://www.nlm.nih.gov/medlineplus/ency/article/000813.htm (last visited 03/10/11).

15

On May 16, 2008, Dr. Dooley indicated that Plaintiff had no pain, that his depression was "much better," and that he had memory loss and a decreased attention span. [R257-58, 399-400]. Plaintiff's medications included Ambien, Seroquel, and Effexor XL. [R258, 400].

On June 24, 2008, Dr. Francis completed another psychological evaluation on a referral from the state agency. [R418-24]. Plaintiff stated that he graduated from high school and attended Morris Brown College for two years before entering the military, but Dr. Francis noted that during a previous evaluation, on October 29, 2007, Plaintiff had indicated that he completed the eleventh grade, attended a special education curriculum, and obtained a GED during the 1990s, but there was no mention of attending college. [R419]. Dr. Francis reported that Plaintiff stated he had a stroke on June 14, 2007, although Social Security records cited the date as June 11, 2007. [R419]. Plaintiff reported that he could not use his left hand very well, that he had spasms in his right foot, that his memory was not good, that he had asthma and acid reflux, and that he was prescribed Zocor, Effexor, Ambien, Seroquel, trazodone, aspirin, Nexium, and albuterol. [R419-20]. Plaintiff reported depression, that he was sad and angry all the time, that he had a short temper, and that he had difficulty concentrating. [R420]. Plaintiff reported that when he was around people, his heart

16

rate increased, his breathing became shallow, he became disoriented, and he tried to get away from them.  [R421].  He reported that he had difficulty staying focused on a movie and had to watch it  three or four times to follow the story.  [R421].  Plaintiff's mood was moderately dysphoric, and he disclosed suicidal ideation, though he denied suicidal plan on the date of evaluation.  [R422].  Dr. Francis found Plaintiff to be a "marginally valid historian of current daily activities, as well as physical and psychological conditions."  [R423].  Dr. Francis summarized the findings by stating that: (1) the evaluation results were most consistent with "a Personality Disorder with Narcissistic and Antisocial traits"; (2) Plaintiff's "maladaptive personality traits appear to lead him into conflicts with others and poor decisions, contributing to his recurrent adjustment reactions"; (3) the possibility of cognitive deficits could not be conclusively ruled out; (4) alcohol abuse was possible but not verified; and (5) Plaintiff's personality disorder would likely result in difficulties with supervisors and coworkers in many settings, although Plaintiff could likely function in some work environments, "provided that he is able to gain insight into his role in conflicts and respond appropriately to supervision."  [R423].

On July 1, 2008, Plaintiff was seen by a physician whose name is illegible. [R425-27, 432-34].  That doctor indicated that Plaintiff's active range-of-motion was

17

normal, that Plaintiff used a cane, and that grip and pinch were normal in right hand and 4+/5 strength in the left.  [R425-27, 432-34].

On July 3, 2008, Diana Whiteman, M.D., conducted a consultative examination for the state agency.  [R429-31].  She noted: (1) a left arm strength of 4+/5 and a grip and pinch on the left hand of 4+/5; (2) that Plaintiff walked with a straight cane but could walk without it; (3) Plaintiff's gait was steady; (4) Plaintiff's hypertension was "stable today"; and (5) that there was residual left arm weakness from "Right cerebrovascular accident June 2007" – i.e., Plaintiff's stroke.  [R430-31].

On July 11, 2008, Arthur Schiff, M.D., conducted a physical RFC assessment. [R435-42.] According to Dr. Schiff, Plaintiff could occasionally lift twenty pounds and frequently lift ten, could stand, sit, or walk for about six hours per eight-hour workday, and push and pull without limit.  [R436].  There were no postural, manipulative, visual, or communicative limitations, and there were no environmental limitations except that Plaintiff should avoid concentrated exposure to "[f]umes, odors, dusts, gases, poor ventilation." [R438-39].  Regarding Plaintiff's subjective symptoms, Dr. Schiff wrote: "Sx attrib to MDI afforded partial credibility with documented improvement seen ***[.]" [R440].  Dr. Schiff noted that there were conclusions from treating/examining sources regarding Plaintiff's physical capacities that were significantly different from

18

Dr. Schiff's; explaining this, Dr. Schiff wrote, "MSS on issues reserved to the commissioner given little weight secondary to 1 A and *** above."  [R441].

On July 17, 2008, Dr. Nealy wrote that Plaintiff had a stable mood, that he had a good response to his medication, that auditory hallucinations had ceased, and that Plaintiff had no medical complaints.  [R493].

On August 5, 2008, John Cooper, Ph.D., completed a PRTF.  [R443-56].  For the category of organic mental disorders, Dr. Cooper  wrote the following as Plaintiff's medically determinable impairment:  "R/O COG. D/O, NOS VS. BIF" ("rule out cognitive disorder not-otherwise-specified versus borderline intellectual functioning") [R444].  Under the affective disorders category, Dr. Cooper wrote: "ADJ. [adjustment] D/O W. DEPRESSED MOOD."  [R446].  Under the category of personality disorders, Dr. Cooper wrote: "R/O PERS. [personality] D/O, NOS W. NARCISSISTIC AND ANTISOCIAL TRAITS."  [R450].  Under the substance addiction disorders category, Dr. Cooper wrote: "R/O ALCOHOL ABUSE."  [R451].    Regarding Plaintiff's functional limitations, Dr. Cooper noted a moderate limitation with respect to activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  [R453].  There were no episodes of decompensation.  [R453].  Dr. Cooper's "consultant's notes": (1) indicated that the "current" consultative

19


examiner diagnosed adjustment disorder with depressed mood and ruled out cognitive disorder not otherwise specified, personality disorder not otherwise specified, and alcohol abuse; (2) stated that the only suggested changes to the initial PRTF and mental RFC were that Plaintiff might have moderate difficulty dealing appropriately with others "SEC. TO PERS. D/O"; (3) gave the consultative examination "significant weight"; and (4) and stated the mental RFC was "still indicated."  [R455].

That same day – August 5, 2008 – Dr. Cooper completed a mental RFC assessment.  [R457-60].  Dr. Cooper found that Plaintiff was moderately limited in the ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms; (6) perform at a consistent pace without an unreasonable number and length of rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism with supervisors; (9) get along well with coworkers or peers without distracting them or exhibiting behavioral extremes;  (10) respond appropriately to changes in the work setting; and (11) be aware of normal hazards and

AO 72A
(Rev.8/8
2)

take appropriate measures.   [R457-58].   In the functional capacity assessment, Dr. Cooper noted that Plaintiff might have difficulty: (1) maintaining concentration, persistence, or pace for more than two hours without a break; (2) dealing appropriately with others in the work setting for more than two hours without a break, due to a possible personality disorder; and (3) responding appropriately to stressful changes in the work setting without support.  [R459].

A discharge from DCSB listing August 6, 2008, as the "transition date" – and signed by Dr. Nealy on September 3, 2008 – notes: (1) "significant progress" since the admittance date on November 7, 2007, with a presenting problem of "depressed due to recent stroke"; (2) reduced depression and suicidal thoughts through medication; (3) a diagnosis of depressive disorder and hypercholesterolemia; and (4) that Plaintiff's medications at discharge were Seroquel 600mg[20] and Effexor 75mg.  [R495-96]. Plaintiff's "GAF" (Global Assessment of Functioning Scale) was 50, which is at the higher end of the range that the Diagnostic and Statistical Manual of Mental Disorders -IV-TR ("DSM-IV-TR) (4th ed. 2000) describes as "Serious symptoms . . . OR any serious impairment in social, occupational, or school functioning."  DSM-IV-TR at 34.

---

[20]     It is unclear when Plaintiff's Seroquel dosage was increased from 400mg to 600mg.

AO 72A
(Rev.8/8
2)

On September 19, 2008, Kristin Dickson, M.D., of DCSB noted that Plaintiff had presented for intake and was seeking to re-open his chart. [R497]. She indicated that Plaintiff last saw Dr. Nealy in July 2008. [R497]. Plaintiff had been out of Seroquel 600mg for a month, was getting angry and irritable more easily, was hearing voices, had been having trouble sleeping, had angry impulses, and denied depression. [R497]. Dr. Dickson restarted Plaintiff's Seroquel and prescribed a follow-up with a treating therapist and psychiatrist. [R498]. On December 10, 2008, Dr. Nealy wrote that Plaintiff's thoughts were organized, that he had no "delusional material or perceptual distortions," and that he had a good response to his medications. [R501]. Plaintiff's listed medications were Seroquel, Effexor, and Klonopin 0.5 mg.[21] On January 9, 2009, Dr. Nealy noted that Plaintiff's mood was stable, that he denied auditory hallucinations, and that he had a good response to his medications. [R502].

On March 2, 2009, a week before his hearing with the ALJ, Plaintiff was seen at DCSB, where he was diagnosed with "Schizophrenic Disorder, Schizoaffective";

---

[21]   Klonopin (clonazepam) is a benzodiazepine that is used to control certain types of seizures and to relieve panic attacks. *See* MedlinePlus, Clonazepam, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html (last visited 03/10/11).

22

hypercholesterolemia; and asthma.  [R461, 504].[22]  His GAF score was 48.  [R461, 504].

C.   *Evidentiary Hearing Testimony* (R24-58)

At the evidentiary hearing, Plaintiff testified that he had not done any work for pay since June 11, 2007, and that he had no income.  [R31-32].  Plaintiff reported that he received monthly treatment at the DCSB for schizophrenia.  [R33].  He testified that these visits were one-on-one counseling sessions with "Ms. Jessie," and that they were helpful.  [R36].  Plaintiff stated that he was taking medication for depression, anxiety, and schizophrenia, and that it was helping.  [R36-37].  He also took Zocor, Klonopin, aspirin, and a multivitamin.  [R37].  Regarding side effects, Plaintiff reported that Seroquel made him sleep really late, and sometimes all day.  [R37].  He stated that he still had residual effects from his June 2007 stroke.  [R37-38].  Specifically, he stated that he still had "paralysis" on his left side – his leg trembled a lot, and he could barely use his left hand (stating that when he held things with his left hand, he tended to drop them).  [R38].  Plaintiff felt that he would not be able to hold a normal job in which he was required to stay on task because his memory and attention span were bad and

---

[22]   It is unclear who made these diagnoses, although the second page of the assessment lists Jessie Mayfield-Gathany, LCSW.  [R462, 505].  At the top-right of the first page, however, is "Status Confirmed/Physician Diagnosis."  [R461, 504].

because his medication had him "sleeping all day most of the time." [R39]. He stated that he walked with a cane, but only to be more comfortable, not because of a doctor's prescription. [R47].

Plaintiff testified that he did not complete high school but instead obtained his GED. [R40]. He reported that he ran out of his medication a couple of times when he was not able to keep an appointment. [R41-42]. He stated that without his medicine, he got very aggressive and mean, but with it, he got along with people fine. [R42, 43-44]. He indicated that his Klonopin was used to help him sleep when he did not have his Seroquel. [R43]. He also reported short-term memory loss, though his long-term memory was good. [R42]. He stated he could not drive because he did not notice things on his left side ("because I got early signs of glaucoma") and because his left foot was not strong, therefore precluding him from pressing down on the brakes (which would give him spasms). [R43].

Questioning the vocational expert ("VE"), the ALJ inquired about unskilled, entry-level occupations for a person of Plaintiff's age, education, and work history who was able to perform work at the light exertional level that does not require constant grasping with the non-dominant hand; that consists of simple, routine, repetitive tasks with one- or two-step instructions; and that does not expose the worker to poor

24

ventilation or extremes of dust, humidity, or temperature.  [R45-46].  In response, the

VE provided three examples of light, unskilled positions fitting those requirements:

parking lot attendant (700 positions in Georgia, 10,000 nationwide), bottle packer

(200 in Georgia, 5,000 nation-wide), and ticket seller (300 in Georgia, 12,000 nation-

wide).  [R46].  The VE stated that all three involved insignificant amounts of walking.

[R47].  Both  the parking lot attendant position and the ticket seller position required

handling money and dealing with the public.  [R47].  Regarding the bottle packing

position, the VE reported that if an individual only had "25% use" of the dominant

upper extremity, he could not perform the job of a bottle packer.  [R53].  He noted that

a person who was not able to maintain work pace and work standards would not be

retained in their employment.  [R52].

Plaintiff's girlfriend, Marilyn Milne – a registered nurse –  also testified at the

evidentiary hearing.  [R53-57].  She reported that Plaintiff's gait when not using his

cane was not steady, that he would trip on inclines or uneven sidewalks – though she

admitted that she had never seen him fall.  [R54-55].  She also stated that Plaintiff was

clumsy with holding things in his left hand.  [R54-55].  Milne reported that Plaintiff

was "totally a different person" when he took Seroquel – "[i]t does help him sleep, but

he's useless the next day or the next couple of days."  [R56].  She stated it made him

25

slow and non-alert.  [R56].  She also stated that it was more than once or twice a year that Plaintiff had gone without his medication – when Plaintiff could not pay, she would go with him to pay.  [R56].  She expressed that when Plaintiff was not on his medication, he became irritable, very agitated, and extremely sensitive: "Someone says something to him and just becomes just mad.  And he will leave a situation or he will walk away totally and disappear for a couple days."  [R56].  Regarding Plaintiff's memory, Milne said that Plaintiff would forget to turn off the water while washing dishes, would forget to flush the toilet after he used it, would forget an appointment, and would forget what day it was.  [R57].  She stated that his long-term memory was excellent, however.  [R57].  Finally, Milne also reported that Plaintiff was very bad at following instructions, stating:

> He'll ask for clarification a couple times.  And then sometimes he'll forget what he's doing in the middle of a task and will have to come back or I'll call him on his cell phone and ask where are you?  Did you complete it?  And he will be doing something totally different that had nothing to do with the task that he's been asked to do.

[R57].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

26

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.  The claimant has not engaged in substantial gainful activity since June 11, 2007, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.).*

3.  The claimant has the following severe impairments: anxiety disorder, adjustment disorder with depressed mood, borderline intellectual functioning, the residual effects of a stroke, and asthma (20 CFR 404.1520(c) and 416.920(c)).

. . .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

. . .

5.  The claimant has the residual functional capacity to perform work that does not require: exertion above the light level (20 CFR 404.1567(b) and 416.967(b)); or constant grasping with the non-dominant hand; or exposure to poor ventilation or extremes of dust, humidity, or temperature; or more than simple, routine, repetitious tasks, with one- or two-step instructions.

. . .

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

7.      The claimant was born on June 4, 1964 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.      The claimant has the equivalent of a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR [("Social Security Ruling")] 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

. . .

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 11, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[R15-21].

The ALJ found that the record did not support a severe substance-abuse impairment, a documented severe personality disorder, or a severe cognitive disorder. [R15-16].   Regarding a severe cognitive disorder, the ALJ noted Dr. Francis's impression that this should be ruled out.  [R16].  The ALJ also noted that Plaintiff's

28

statements to Dr. Francis about his education were inconsistent – Plaintiff told Dr. Francis in October 2007 that he was in special education and later obtained his GED (but denied learning difficulties), but Plaintiff then told Dr. Francis in June 2008 that he had graduated from high school and had attended college for two years, a discrepancy that Dr. Francis noted. [R16]. As a result of this, the ALJ did not find a diagnosed cognitive disorder, but he stated that in any event, the adopted RFC specified simple, routine tasks that "should accommodate any shortcomings in this area." [R16]. Later, the ALJ stated that he had assessed Plaintiff's borderline intellectual functioning, noting that Dr. Francis had diagnosed this impairment in October 2007 but not when he examined Plaintiff again in June 2008. [R17]. The ALJ acknowledged that Dr. Francis found an IQ performance score of 69 in October 2007, but the ALJ stated that there was evidence that this was not a true indicator of Plaintiff's intellectual status, noting that while Plaintiff had been in special education classes, he had been able to obtain his GED. [R17].

In conducting Plaintiff's RFC assessment, the ALJ found that Plaintiff's treatment records document that he has severe mental impairments but that they were "not to a disabling extent." [R18]. The ALJ noted that Dr. Fioranelli had completed a form in August 2007 in which he: (1) found an abnormal affect and mood brought on

29

by recent stress; and (2) concluded that it was "somewhat likely" that Plaintiff would decompensate under stress. [R18]. The ALJ did not find this inconsistent with the adopted RFC, but the ALJ further noted that he was inclined to give the form little weight because: (1) Dr. Fioranelli did not explain the blocks he checked in any detail, nor did he reference any treatment records; and (2) the ALJ was unable to find any evidence in the record that Dr. Fioranelli had treated or examined Plaintiff. [R18].

The ALJ also discussed some of Plaintiff's subjective symptoms, noting that Plaintiff used a non-prescribed cane, reported short-term memory problems (which were confirmed by Plaintiff's friend), reported that he could not sustain full-time employment because of bad memory and attention and because he sleeps all day because of his medication, and reported limited vision on his left side (although the ALJ stated that Plaintiff's eye examinations did not confirm this). [R19]. The ALJ concluded that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements were not credible to the extent they were inconsistent with the ALJ's RFC assessment. [R19]. The ALJ concluded that the RFC adequately addressed any shortcomings documented in the record, noting that the RFC protected Plaintiff against environmental irritants to

30

accommodate his asthma, and that it specified very simple tasks to address any reduction in concentration, persistence, or pace.  [R19].

To determine the extent to which Plaintiff's limitations "erode the unskilled light occupational base," the ALJ asked the VE whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and RFC.  [R20]. According to the ALJ, the VE testified that the hypothetical individual could work as a parking lot attendant, bottle packer, and ticket seller.  [R20].  The ALJ noted that while the VE stated that parking lot attendants and ticket sellers deal with the public, Plaintiff had testified that dealing with the public was not a problem for him when he took his medication.  [R20].  Given the VE's testimony, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff was capable of performing work that existed in significant numbers in the national economy, and therefore a finding of "not disabled" was appropriate.  [R20].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

31

12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities that are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limit his ability to perform basic work-related activities.

AO 72A
(Rev.8/8
2)

*See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any

33

substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.      SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as

34

adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).   In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.    CLAIMS OF ERROR

Plaintiff raises the following issues: (1) whether the ALJ properly assessed the opinions regarding Plaintiff's intellectual functioning; (2) whether the ALJ erred in disregarding Dr. Fioranelli's opinion on the basis that the record did not reflect that Dr. Fioranelli ever treated Plaintiff; (3) whether the ALJ erred in not referencing Dr. Cooper's finding that restricted Plaintiff in eleven categories; (4) whether the ALJ erred in "challenging medical opinions both of the doctors and the Plaintiff because of

35

a lack of ongoing treatment"; (5) whether the ALJ failed to sufficiently consider the effect of Plaintiff's medications on Plaintiff, and whether these effects were also not considered by the vocational expert; and (6) whether the ALJ erroneously failed to pose a hypothetical question to the VE that encompassed all of Plaintiff's impairments. [Doc. 11 at 1-3].

### A.    Plaintiff's Intellectual Functioning

Plaintiff first argues that it is "curious" for the ALJ to find Plaintiff not credible for relating an inaccurate educational and work history, because Plaintiff's medical record reflects that he is "borderline retarded," heavily medicated, and "suffering from definite mental disorders that set forth a definitive impairment in his ability to function," and therefore it is unsurprising that Plaintiff is a "miserable historian." [Doc. 11 at 8]. Plaintiff further argues that it was improper for the ALJ to disregard the findings of Dr. Francis (who found that Plaintiff had an "IQ performance of 69, and a Full Scale of IQ of 75," as summarized in Plaintiff's brief) on the grounds that Plaintiff had a GED, because of Plaintiff's "feeble" academic record and low reading and math skills. [*Id.* at 9-10]. In addition, while Plaintiff acknowledges the VE's testimony that Plaintiff had previously worked at jobs that were semi-skilled, Plaintiff notes that those activities pre-date Plaintiff's June 11, 2007, stroke. [*Id.* at 10]. Plaintiff also notes that

36

scheduling appointments at Grady Memorial Hospital (where Plaintiff was hospitalized on June 12, 2007) is difficult, as is obtaining records from there.  [*Id.* at 11].

In response, apart from the issue of medication side effects (addressed later[23]), the Commissioner does not appear to have responded to any of the above contentions.

In reply, Plaintiff reaffirms the arguments from his original brief.  [Doc. 13 at 1].

As noted below, the undersigned concludes that this case must be remanded to the Commissioner.  As to the current issue, the Court concludes that the ALJ should explicitly address certain evidence on remand.  As support for the ALJ's conclusion that Plaintiff's IQ performance score of 69 was "not a true indicator of [Plaintiff's] intellectual status," [R17], the ALJ stated the following: (1) although Plaintiff took special education classes, he earned his GED; (2) the VE testified that Plaintiff had previously worked at semi-skilled jobs; (3) Plaintiff's earnings reflect substantial gainful activity as recently as 2005; and (4) in any event, the RFC adopted specified "the simplest of tasks."  [R17].  Regarding the first three of these, as Plaintiff points out, [Doc. 11 at 10], each occurred prior to Plaintiff's June 2007 stroke.  While it would

---

[23]    In Plaintiff's brief, the heading for this issue states that "[t]he ALJ disregarded or discounted the Claimant's documented borderline intellectual functioning and extended use of medication."  [Doc. 11 at 7].  Because a later issue specifically involves the side effects of Plaintiff's medications, the Court will discuss those issues then.

be inappropriate to presume without medical evidence that some of Plaintiff's problems resulted from the stroke, there was some indication in the record that this was the case. Less than a week after his stroke, Plaintiff complained of depression to Dr. Fioranelli. [R269]. It does not appear from the record that Plaintiff previously had complained of this, and in December 2007 he told Dr. Nealy that he had not had psychiatric treatment prior to the stroke. [R477]. A February 2008 clinical assessment lists as a presenting problem that Plaintiff was "depressed since stroke and feeling depressed and having difficulty sleeping panic attacks around others. Having difficulty with memory." [R373]. March 2008 notes from Dr. Dooley indicated that Plaintiff's girlfriend reported that Plaintiff had a decreased attention span since the stroke. [R261, 403]. Dr. O'Neil, a state-agency non-treating psychologist, reported the following: "BIF; likely cognitive decline due to stroke." [R322]. Finally, the treatment notes of Dr. Cooper indicate in the "assessment" portion of the notes that Plaintiff's depression, memory loss, and decreased attention span were "since CVA" (cerebrovascular accident) – i.e., since the stroke. [R404].

Given the significant changes in functioning documented after Plaintiff's stroke and the suggestions that they may be tied to the stroke, it was inappropriate for the ALJ not to address that evidence when considering Plaintiff's "intellectual status," [R17].

38

That additional evidence includes the following.  First, Dr. Francis's October 2007 evaluation noted that Plaintiff's performance IQ of 69 was in the "extremely low average range," and Plaintiff was diagnosed with borderline intellectual functioning. [R315-16].  In that same (October 2007) assessment, Dr. Francis noted that Plaintiff "may not be able to reliably and consistently carry out simple instructions."  [R316]. While Dr. Francis's later, June 2008 evaluation did not include the BIF diagnosis, Dr. Francis noted that "[t]he possibility of cognitive deficits cannot be ruled out conclusively based on the data available."  [R423].

The ALJ did not specifically address this evidence, nor did he give any indication that he considered the possibility that the stroke may have affected Plaintiff's cognitive functioning, as several medical sources indicated.  Because the Court finds, for reasons explained below, that the ALJ's decision should be reversed on other grounds, on remand the ALJ should explicitly consider this other evidence when fashioning a new RFC.[24]

_____

[24]     Given that the ALJ listed borderline intellectual functioning as one of Plaintiff's severe impairments despite discounting the evidence that Plaintiff had an IQ performance score of 69, it is not clear that having the ALJ specifically consider the other evidence will yield a different result for Plaintiff – but that is for the ALJ to determine on remand.

**B.      Dr. Fioranelli, Dr. Cooper, Dr. O'Neil, and Dr. Francis**[25]

Plaintiff argues that the ALJ erred in discounting Dr. Fioranelli's opinion and ignoring altogether the findings of Drs. Cooper and O'Neil.  [Doc. 11 at 11-15]. Plaintiff first points to Dr. Fioranelli's conclusion that it was "somewhat likely" that Plaintiff would decompensate under stress.  [*Id.* at 13 (referring to R277)].  Plaintiff notes that the ALJ stated that he gave Dr. Fioranelli's opinion limited weight because there was no indication in the record of Dr. Fioranelli having treated Plaintiff, but Plaintiff states to the contrary that Dr. Fioranelli's "record of treatment" is plainly set forth in the record.  [*Id.* at 11-13 (citing R405-12)].  Plaintiff also observes that another doctor, Dr. Francis, found that Plaintiff "was borderline intellectual functioning" and that his personality disorder would likely result in difficulties with supervisors and coworkers in many settings.  [*Id.* at 12-13 (emphasis omitted) (citing R316)].

In addition to Dr. Fioranelli's opinion that Plaintiff was somewhat likely to decompensate under stress, Plaintiff also points to the same opinion of Dr. Cooper. [*Id.* at 13-14].  According to Plaintiff, both the ALJ and VE were required to – but did not – consider the reports of Drs. Cooper and O'Neil.  [*Id.* at 14].  Plaintiff states that

---

[25]      Although the issue heading does not mention Dr. Francis, Plaintiff discusses Dr. Francis as part of that issue.  [*See* Doc. 11 at 11-13].

AO 72A
(Rev.8/8
2)

Dr. Cooper's report from August 5, 2008, found that Plaintiff was moderately limited in eleven areas; according to Plaintiff, those findings were markedly worse than those in Dr. O'Neil's earlier report from November 7, 2007, where Dr. O'Neil noted eight such moderate limitations. [*Id.* at 14-15]. Plaintiff argues that these reports were ignored. [*Id.* at 15].

The Commissioner responds that, contrary to Plaintiff's contentions, substantial evidence supports the ALJ's decision to give little weight to Dr. Fioranelli's opinion. [Doc. 12 at 4]. The Commissioner argues that the weight afforded a medical source's opinion on the nature and severity of a claimant's impairments depends on a variety of factors, and that even a treating physician's opinion may be discounted when the opinion is not well-supported by medically acceptable diagnostic techniques or if the opinion is inconsistent with the record as a whole. [*Id.* at 4-5 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159-60, (11th Cir. 2004); *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004); 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-2p)]. Moreover, states the Commissioner, opinions on some issues – such as whether a claimant is disabled and the claimant's RFC – are not medical opinions but are instead opinions on issues reserved for the Commissioner because they are administrative findings dispositive of a case. [Doc. 12 at 5 (citing, *inter alia*, 20 C.F.R.

41

§§ 404.1527(e), 416.927(e))].  While the Commissioner acknowledges that statements

from acceptable medical sources about what a claimant can do are still relevant

evidence, he argues that they are not determinative, because it is the ALJ's

responsibility to assess a claimant's RFC.  [Doc. 12 at 5 (citing 20 C.F.R. §§ 404.1527,

404.1545, 404.1546(c), 416.927, 416.945, 416.946(c); SSR 96-5p)].    The

Commissioner notes that, here, the ALJ found Dr. Fioranelli's medical source statement

was conclusory and did not explain the reasons he checked certain boxes, nor did it

reference any treatment records.  [Doc. 12 at 6].  According to the Commissioner, a

check on a form without supporting evidence does not provide much insight into a

claimant's limitations.  [*Id.* (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.

1993))].  Further, the Commissioner asserts that Dr. Fioranelli's notes do not provide

objective medical signs or findings to support the limitations included in his August

2007 opinion, and while Dr. Fioranelli noted Plaintiff's depression, insomnia, and

asthma, findings and diagnoses do not establish disabling limitations.  [Doc. 12 at 6].

The Commissioner next turns to Plaintiff's contention that the ALJ did not

explain the weight given to the PRTFs completed by Dr. O'Neil in November 2007 and

Dr. Cooper in August 2008.  [*Id.* at 7].  The Commissioner states that Drs. O'Neil and

Cooper concluded Plaintiff had a severe mental impairment but did not have an

42

impairment that met or equaled a listed impairment, and that the ALJ also used a psychiatric review technique and came to the same conclusion. [*Id.* (citing R15-17, 321-34, 443-58]. Thus, according to the Commissioner, the ALJ's decision is consistent with the PRTFs completed by Drs. O'Neil and Cooper. [Doc. 12 at 7-8]. The Commissioner further argues that to the extent Plaintiff is arguing that the PRTFs set forth functional limitations, Plaintiff is incorrect. [*Id.* at 8]. The Commissioner observes that SSR 96-8p states that the limitations identified in "paragraph B" and "paragraph C" criteria on the PRTF are not an RFC assessment but are used to rate the severity of a claimant's mental impairments at steps two and three of the sequential evaluation process. [*Id.* (citing SSR 96-8p; 20 C.F.R. §§ 404.1520a(d)(1)-(3), 416.920a(d)(1)-(3); 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00)]. According to the Commissioner, Drs. O'Neil and Cooper's notations in the PRTFs do not represent their assessment of Plaintiff's mental limitations; rather, they provided Plaintiff's mental RFC in section III of the mental RFC form, and that opinion also supports the ALJ's assessment of Plaintiff's RFC. [Doc. 12 at 8 (citing R319, 459)]. The Commissioner asserts that as a result of this, the ALJ did not need to include the PRTF notations in his assessment of Plaintiff's RFC or otherwise discuss Drs. O'Neil and Cooper's PRTFs. [Doc. 12 at 8-9 (citing, *Martino v. Barnhart*, No. 01-17085, 2002 WL 32881075, *2

43

(11th Cir. Sept. 27, 2002) (*per curiam*) (holding that the ALJ is "not required to incorporate the "B" criteria of PRTFs in their residual functional capacity assessment" (citing SSR 96-8p)); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (holding, under the circumstances of the case, that the ALJ did not need to include a "finding" on the PRTF in the hypothetical question to the VE)].

Finally, the Commissioner turns to Plaintiff's contention that the ALJ overlooked Dr. Francis's opinion that Plaintiff's personality disorder would likely result in difficulties with supervisors and coworkers. [Doc. 12 at 9 (citing R423)]. The Commissioner contends that the significant limitations the ALJ included in his assessment of Plaintiff's mental limitations (limiting Plaintiff to simple, repetitious work with one- and two-step instructions) encompassed the limitations Dr. Francis noted in his opinion. [*Id.*]. In support of this argument, the Commissioner first states that the record does not indicate that requiring Plaintiff to perform the minimal tasks the ALJ included in Plaintiff's mental RFC assessment would cause Plaintiff to have difficulties with supervisors or coworkers. [*Id.*]. The Commissioner continues by stating that to the extent Dr. Francis's opinion is interpreted as imposing greater limitations than those found by the ALJ, his opinion would not be supported by his own clinical notes or the other evidence in the record. [*Id.* at 9-10]. As examples, the

44

Commissioner first notes that Dr. Francis qualified his opinion "by stating that Plaintiff nonetheless could function in some work environments provided that he is able to gain insight into his role in conflicts and respond appropriately to supervisors." [*Id.* at 10 (citing R423)]. Second, the Commissioner points out that Dr. Francis did not indicate in his previous, October 2007 opinion that Plaintiff would have difficulties with supervisors and coworkers, but instead stated that Plaintiff could understand simple instructions and had adequate concentration but would have some difficulty adhering to a work schedule and maintaining an adequate pace, [*id.* (citing R316)]. The Commissioner argues that Plaintiff has not explained why the ALJ should have given greater credence to Dr. Francis's June 2008 opinion than to the October 2007 opinion. [*Id.* (citing, *inter alia*, *Stanley v. Sec'y of Health and Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1990) (holding that the ALJ did not err in declining to refer to physician's opinion because the physician changed his opinion without providing objective medical evidence "to support his change of heart"))]. Further, the Commissioner notes that while Dr. Francis diagnosed Plaintiff with an adjustment disorder, Dr. Francis's notes do not indicate that Plaintiff's condition imposed disabling limitations. [Doc. 12 at 11 (citing, *inter alia*, *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of [a condition], of course, says nothing about the severity of the

45

condition.")]. In conclusion, the Commissioner contends that given the evidence regarding Plaintiff's mental condition and the significant limitations included in the ALJ's mental RFC assessment of Plaintiff, the ALJ did not need to specifically include a finding that Plaintiff's alleged personality disorder would likely result in difficulties with supervisors and coworkers, and that an RFC finding including "that aspect of Dr. Francis's opinion over and above" the limitations already included by the ALJ in his RFC finding would be unsupported by the medical findings and inconsistent with the record as a whole. [Doc. 12 at 11].

In reply, Plaintiff does not address the Commissioner's arguments but instead reaffirms the arguments from his original brief. [Doc. 13 at 1].

The Commissioner evaluates every medical opinion that it receives, regardless of the source. 20 C.F.R. §§ 404.1527(d), 416.927(d). Thus, both examining and nonexamining sources provide opinion evidence for the ALJ to consider in rendering a decision. 20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f). In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the

46

familiarity of the medical source with information in claimant's case record.  20 C.F.R.

§§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

The opinion of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.  *Phillips*, 357 F.3d at 1241(citing *Lewis*, 125 F.3d at 1440).  Good cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips*, 357 F.3d at 1241.

When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons.  *Id.*  A one-time examining (i.e., consulting) physician's opinion is not entitled to great weight.  *Crawford*, 363 F.3d at 1160.  Also, in the Eleventh Circuit, "the report of a non-examining doctor is accorded little weight if it contradicts an examining doctor's report; such a report, standing alone, cannot constitute substantial evidence."  *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991); *see also Kemp v. Astrue*, No. 08-12805, 2009 WL 163019, *3 (11th Cir. Jan. 26, 2009).

*Dr. Fioranelli:* The Court initially notes that the ALJ was incorrect to suggest that nothing in the record indicates that Dr. Fioranelli treated or examined Plaintiff,

47

[R18].  Several portions of the record indicate that Dr. Fioranelli was a treating physician of Plaintiff.  [*See* R259-60, 265-70, 397-98, 401-02, 407-12].

However, the incorrect assertion that Dr. Fioranelli was not Plaintiff's treating physician was not the only reason cited by the ALJ for giving Dr. Fioranelli's opinion limited weight.  The ALJ also stated that Dr. Fioranelli did not explain in detail why he checked certain boxes, nor did he reference any treatment records.  [R18 (referencing R275-78, the "Mental Impairment Questionnaire")].  On the form in question, Dr. Fioranelli's only comment on his conclusion that Plaintiff was "somewhat likely" to decompensate under stress was the following: "Depressed affect and mood, brought on by recent stroke.  Not currently suicidal."  [R275-76].  While Dr. Fioranelli had seen Plaintiff on multiple occasions prior to filling out the questionnaire, these are fairly conclusory statements that entitled the ALJ to adjust the weight given to the opinion.  *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

Nevertheless, the ALJ did not properly evaluate Dr. Fioranelli's records generally because the ALJ did not recognize Dr. Fioranelli as a treating physician.  Because the Court finds (as discussed below) that the ALJ erred in conducting the RFC assessment, when fashioning a new RFC on remand the ALJ should reconsider Dr. Fioranelli's conclusions in light of the fact that he was indeed a treating physician.

48

*Drs. Cooper and O'Neil:*  The Court next turns to Plaintiff's contention that the

ALJ erred by not referencing or considering the report of Drs. Cooper and O'Neil,

[Doc. 11 at 14].  As the Commissioner references, [Doc. 12 at 9],

> the limitations identified in the "paragraph B" and "paragraph C" criteria
> are not an RFC assessment but are used to rate the severity of mental
> impairment(s) at steps 2 and 3 of the sequential evaluation process.  The
> mental RFC assessment used at steps 4 and 5 of the sequential evaluation
> process requires a more detailed assessment by itemizing various
> functions contained in the broad categories found in paragraphs B and C
> of the adult mental disorders listings in 12.00 of the Listing of
> Impairments, and summarized on the PRTF.

SSR 96-8p at *4; *accord Martino*, 2002 WL 32881075 at *2 ("The ALJ is not bound

by a state agency psychologist's findings, 20 C.F.R. § 41[6].927(f)(2)(i), and is not

required to incorporate the "B" criteria of PRTFs in their residual functional capacity

assessment." (citing SSR 96-8p)).  But while an ALJ is not *required* to incorporate the

"B" criteria into the RFC assessment, an ALJ *may* do so.  On this very point, the

Eleventh Circuit has recently stated that "[t]hough the PRT and RFC evaluations are

undeniably distinct, *see* 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3), nothing

precludes the ALJ from considering the results of the former in his determination of the

latter."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)

(rejecting Commissioner's argument that including limitations on concentration,

49

persistence, or pace in a hypothetical question "would inappropriately conflate independent inquiries – the PRT, at steps two and three, and the RFC, at step four"). In any event, because the ALJ was not required to incorporate the functional limitations marked under the "B" criteria on the PRTFs, Plaintiff's assertion that the ALJ's RFC assessment was incorrect is not bolstered by that argument.

The law described above, however, still does not explain why the mental RFC assessments conducted by Drs. O'Neill and Cooper, [R317-20, 457-60], were not mentioned in the ALJ's decision, and the Commissioner has not provided any authority for the proposition that this was not improper. While ALJs "are not bound by any findings made by State agency medical or psychological consultants," those individuals "are also experts in Social Security disability evaluation," and therefore ALJs "must consider [their] findings and other opinions . . . as opinion evidence, except for the ultimate determination about whether you are disabled." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). "The RFC assessment must always consider *and address* medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p at *7 (emphasis added). In not addressing these limitations, the ALJ erred.

AO 72A
(Rev.8/8
2)

Further, the error was not harmless. The ALJ's adopted RFC assessment provides for "simple, routine, repetitious tasks, with one- or two-step instructions." [R17]. This is consistent with much of the RFC assessments conducted by Drs. O'Neil and Cooper, [R317-20, 457-60], but Dr. Cooper's assessment (which was completed after Dr. O'Neil's) states that Plaintiff might have difficulty: (1) maintaining concentration, persistence, or pace for more than two hours without a break; (2) dealing appropriately with others in the work setting for more than two hours without a break, due to a possible personality disorder; and (3) responding appropriately to stressful changes in the work setting without support. [R459]. This statement conflicts with the ALJ's adopted RFC assessment to the extent that the ALJ's RFC assessment does not address the need for such frequent breaks, and therefore the ALJ was required to explain why the opinion was not adopted, SSR 96-8p at *7. At oral argument, counsel for the Commissioner admitted that this statement undercut the Commissioner's argument, but he stated that this statement should have been included on the PRTF (and, implicitly, not included in Dr. Cooper's RFC assessment). The Commissioner did not have any authority to support this proposition apart from two cases cited in the Commissioner's brief – *Smith* and *Martino* – but those cases do not address the question of what is properly included in an RFC assessment versus what is properly

51

included on a PRTF.  It is not apparent to the Court that the statement quoted above was not proper for inclusion in a mental RFC assessment, and the Court will not assume otherwise.  Because Dr. Cooper opined that Plaintiff might have difficulty working for more than two hours without a break, and because this conclusion is not addressed by the ALJ's adopted RFC, the Court finds that the ALJ's error in not addressing Dr. Cooper's mental RFC assessment was not harmless.  On remand, the ALJ should explicitly address the mental RFC assessments of both Dr. Cooper and Dr. O'Neil.

*Dr. Francis:* Dr. Francis opined that Plaintiff's alleged personality disorder "will likely result in difficulties with supervisors and coworkers in many work settings," [R423].  The ALJ also did not address this statement.  As with the other evidence discussed above, the ALJ should explicitly address this on remand.[26]

### C.      Lack of Treatment in the Record

Although Plaintiff's argument is not entirely clear, he appears to argue first that – as stated above – the ALJ failed to properly consider the records of Drs. Francis, Fioranelli, Cooper, and O'Neil, along with Plaintiff's testimony, and, second, that it

---

[26]      The Court notes, however, that Plaintiff's own testimony somewhat cuts against Dr. Francis's statement in that Plaintiff testified that when he took his medication he was "pretty calm" and "g[o]t along with people fine."  [R42, 44].

52

was not realistically possible for Plaintiff to establish a well-documented medical record.  [Doc. 11 at 16-17].

Regarding the first argument, Plaintiff reiterates the earlier assertion that the ALJ failed to consider the findings of Drs. Cooper and O'Neil, and Plaintiff cites *MacGregor v. Bowen*, 786 F.2d 1050 (11th Cir. 1986), for the proposition that where the Commissioner has ignored or failed to a refute a treating physician's testimony, he has accepted it as true.  [Doc. 11 at 16-17].  Regarding the second argument, Plaintiff states that "the medical documentation generally required to establish recurrent episodes of recurrent severe panic attacks manifested by sudden unpredictable onset of intense apprehension, fear terror and sense of impending doom occurring on an average of once a week, as set forth in POMS Section D 34001.032, 12:06," was not realistically attainable because he was without income or insurance and because visits to Grady Memorial Hospital are not available on a weekly basis.  [Doc. 11 at 17].

The Commissioner's response to the arguments regarding the records of Drs. Francis, Fioranelli, Cooper, and O'Neil have already been addressed above.  As also stated above, the Commissioner does not respond to Plaintiff's contentions regarding the ability to obtain regular appointments at Grady Memorial Hospital.

53

In reply, Plaintiff does not address the Commissioner's arguments but instead reaffirms the arguments from his original brief.  [Doc. 13 at 1].

The Court has already addressed above the arguments regarding the records of Drs. Francis, Fioranelli, Cooper, and O'Neil.

Next, Plaintiff appears to argue that the ALJ erred in finding gaps in treatment because Plaintiff lacked insurance and income to obtain treatment.  [*See* Doc. 11 at 17 (noting that Plaintiff suffered from "recurrent episodes of recurrent severe panic attacks" because of his lack of insurance and income)].  The record does not support such an argument.  The ALJ concluded that Plaintiff's complaints of experiencing frequent panic attacks were not documented.  [R16].   However, there is no evidence in the record that Plaintiff failed to seek *treatment* for his panic attacks due to lack of an ability to pay for treatment.  Rather, the evidence shows that Plaintiff failed to take his medicine at times due to lack of resources, [*see, e.g.*, R56 (girlfriend's testimony)], but Plaintiff testified that he ran out of medications because he failed to keep his appointment with his psychiatrist.  [R41-42].  As a result, the Court finds that the ALJ did not err in failing to take into account Plaintiff's impecuniosity.  *Compare Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) ("We have held that refusal to follow prescribed medical treatment without a good reason will preclude a finding of

54

disability, and poverty excuses noncompliance.  Additionally, when an ALJ relies on noncompliance as the sole ground for the denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment.") (citing *Dawkins v. Bowen*, 848 F.2d 1211, 1213-14 (11th Cir. 1998) (internal quotation marks omitted); *accord Martin v. Astrue*, No. 1:09-CV-3497, 2010 WL 3881201, *7 (N.D. Ga. Sept. 28, 2010) (King, M.J.) (citing SSR 96-7p).[27]

### D.    The Effect of Plaintiff's Medications

Plaintiff argues that the record demonstrates that he took a number of prescription medications, including Effexor, Seroquel, Nexium, Zocor, and Klonopin;

---

[27]    The Court also notes that while Plaintiff references the requirements of the POMS (Program Operations Manual System),

> POMS does not have the force of law.  *See Schweiker v. Hansen*, [450 U.S. 785, 789] (1981) (claims manual of the SSA is not a regulation and has no legal, binding force).  POMS . . . is only used for guidance at the lower levels of adjudication, i.e., at the State agency and at the Social Security Administration district office.  POMS do[es] not carry the power or authority of law and it is not enforceable at the Administrative Law Judge hearing level[.]

*Wells v. Michael J. Astrue*, No. 8:09-CV-1947-T-TGW, 2010 WL 3894788, *4 (M.D. Fla. Oct. 4, 2010) (internal quotation marks omitted).

AO 72A
(Rev.8/8
2)

that Seroquel made him sleepy; and that failure to take his medication leaves him combative and agitated.  [Doc. 11 at 18 (citing R37, 43, 56, 243)].  According to Plaintiff, the side effects of these medications are germane to a disability finding, yet they were never completely addressed by the ALJ, nor were they presented to the VE. [*Id.*].  Plaintiff acknowledges the ALJ's conclusion that Plaintiff's medication allowed him to deal with the public, but Plaintiff asserts that the other effects of the medication were not addressed, and "that conclusion was not put forth to the [VE]."  [*Id.* at 21-22].

In response, the Commissioner contends that: (1) the ALJ properly considered Plaintiff's allegations and the other evidence of record in evaluating his credibility and in assessing his RFC, [Doc. 12 at 12 (citing R15-10)]; (2) the medical records submitted to the ALJ did not document complaints of side effects (and therefore the records did not indicate that any side effects would have interfered with Plaintiff's ability to work), apart from one note that Plaintiff felt irritable on Celexa (which was discontinued), [*id.* (citing R487)]; and (3) to the contrary, the medical records indicated that Plaintiff had a good response to his medication, [*id.* (citing R488, 490, 493, 501-02)].

In reply, Plaintiff does not address the Commissioner's arguments but instead reaffirms the arguments from his original brief.  [Doc. 13 at 1].

AO 72A
(Rev.8/8
2)

The Court finds that the ALJ did not err in addressing Plaintiff's medication side effects.  When a claimant attempts to establish disability through his own testimony of subjective symptoms, the Eleventh Circuit requires: " '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged symptom arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged symptom.' " *Carter v. Comm'r of Soc. Sec.*, No. 10-11192, 2011 WL 292255, *2 (11th Cir. Feb. 1, 2011) (*per curiam*) (alteration omitted) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  The ALJ has discretion in making credibility determinations after listening to a claimant's testimony, "[b]ut the ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Holt*, 921 F.2d at 1223.  As a result, the credibility determination cannot be "a broad rejection which is 'not enough to enable [the court] to conclude that [the ALJ] considered [a plaintiff's] medical condition as a whole.' " *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Foote*, 67 F.3d at 1561).  "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562.  If the ALJ fails to

57

explain the reasons that he discredited a claimant's testimony, the testimony must be accepted as true.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

At oral argument, the Commissioner argued that there was clear case law in the Eleventh Circuit on the side-effects issue, citing *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986), and *Passopulos v. Sullivan*, 976 F.2d 642 (11th Cir. 1992).  According to the Commissioner, *Jones* states that absent some reference to side effects in treatment notes, it is not error to discount Plaintiff's complaints.  The Court does not find such a proposition in *Jones*, however.[28]  In that case, the ALJ had determined that "[t]he claimant's testimony concerning his sleepiness, chest pain, loss of vision, back pain and swelling in his legs, knees and feet and their effect on his ability to work prior to June, 1983, was not credible to the extent alleged."  *Jones*, 810 F.2d at 1004.  Citing

---

[28]     *Passopulos* is also unhelpful for the Commissioner.  There, Eleventh Circuit stated:

> The ALJ did not have any evidence that Passopulos was taking medication for a mental impairment which caused side effects for his consideration.  *See generally Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990) (holding that an ALJ's determination on side effects was proper where the claimant did not complain about side effects nor did the record disclose any concerns about side effects by the doctors examining the claimant).

976 F.2d at 648.  Because it is apparent that Plaintiff was in fact taking Seroquel, and because Plaintiff testified that it caused him to feel sleepy all day, this case is distinguishable from both *Passopulos* and *Swindle*.

58

the requirement discussed in *Viehrman v. Schweiker*, 679 F.2d 223, 228 (11th Cir. 1982), that the fact-finder articulate reasons for questioning a claimant's credibility when his testimony is "critical," along with another requirement (irrelevant here) regarding discrediting testimony that pertains to subjective pain, the Eleventh Circuit found that the ALJ's statement that the plaintiff's testimony "was not credible to the extent alleged" was "clearly insufficient" under those standards. *Jones*, 810 F.2d at 1004. The court nevertheless found no error in the Commissioner's credibility determination, however, because the Appeals Council had recognized the shortcomings in the ALJ's decision and set forth more specific reasons for not fully crediting the plaintiff's testimony. *Id.* Specifically, with respect to the plaintiff's subject complaints of sleepiness, the Appeals Council noted "medical treatment for sleepiness." *Id.*

Here, the ALJ's statement that "[t]he record does not support medication side effects that would prevent sustained exertion," [R19], is barely less conclusory than the statement found "clearly insufficient" in *Jones*, 810 F.2d at 1004. Brief though the explanation may be, however, the ALJ's statement does provide a reason for rejecting Plaintiff's testimony at the evidentiary hearing: there is no indication of such side

effects in the record.[29]  Because of lack of evidence in the record (apart from Plaintiff's testimony at the hearing before the ALJ) indicating any side effects from Plaintiff's medications that would inhibit his ability to work within the bounds of the ALJ's adopted RFC assessment, the Court finds that substantial evidence supports the ALJ's implicit determination to discount Plaintiff's testimony that he could not sustain full-time employment on the basis of side effects of his medication, [*see* R19].  *See Carter*, 2011 WL 292255 at *2.

### E.     The ALJ's Failure to Pose a Hypothetical Question to the VE Comprising All of Plaintiff's Impairments

Finally, Plaintiff argues that the ALJ erred in failing to pose to the VE a hypothetical question encompassing all of Plaintiff's impairments.  [Doc. 11 at 19]. Plaintiff acknowledges that Dr. Cooper's August 5, 2008, report – in which Dr. Cooper diagnosed Plaintiff with narcissistic and anti-social traits and designated "moderate" functional limitations in certain areas, [R453] – may not alone establish disability. However, he argues, when considered in conjunction with Plaintiff's other impairments resulting from the June 2007 stroke (including limits on his left arm and left leg, effects on his gait, and his "compromised thought process"), that his burden of proving

---

[29]     Plaintiff did complain about feeling irritable while on Celexa, and that medication was subsequently discontinued.  [R487].

AO 72A
(Rev.8/8
2)

disability has been met. [*Id.* at 18-19]. In any event, Plaintiff asserts, in order for the testimony of a VE to constitute substantial evidence, it is an absolute requirement that the ALJ pose a hypothetical question encompassing all of a claimant's impairments. [*Id.* at 19-20 (citing *Glover v. Astrue*, No. CA 08-0291-C, 2009 WL 455483, [no pin-cite] (S.D. Ala. Feb. 19, 2009))]. He argues that, contrary to this requirement, the ALJ's hypothetical only included Plaintiff's physical limitations and was "woefully non-specific" even in that. [Doc. 11 at 20]. In particular, Plaintiff states that the ALJ presented no hypothetical addressing Plaintiff's well-documented short-term memory problems or his ongoing problems in dealing with others. [*Id.*]. According to Plaintiff, the ALJ's hypothetical failed to address the effects of Plaintiff's medications (as mentioned above); Plaintiff's specific functional mental impairments; his schizophrenia; his multiple reports of auditory and visual hallucinations; evidence regarding his concentration, persistence, or pace; his documented lethargy; and his restrictions on daily living activities. [*Id.* at 20-21].

In response, the Commissioner states that the ALJ asked the VE whether an individual with Plaintiff's age, education, work experience, and RFC could perform any jobs, and thus the VE's testimony was based on a hypothetical question that fairly set out all of Plaintiff's reasonable limitations. [Doc. 12 at 13-14]. According to the

AO 72A
(Rev.8/8
2)

Commissioner, an ALJ is not required to include in a hypothetical question reference to a claimant's diagnoses, impairments, or intelligence test scores. [*Id.* at 14]. Instead, the Commissioner states, the hypothetical question need only include the claimant's functional limitations that are supported by the record. [*Id.* (citing *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *McSwain v. Bowen*, 814 F.2d 617, 619-20 (11th Cir. 1987); *Graham v. Bowen*, 790 F.2d 1572, 1576 (11th Cir. 1986)]. The Commissioner contends that a VE is not qualified to interpret diagnoses or other medical evidence; rather, it is the ALJ's duty to review the medical evidence and set forth the claimant's credible limitations to the VE, which was done here. [Doc. 12 at 14 (citing R45-46 and *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 247 (6th Cir. 1987) ("The vocational expert did not determine what restrictions claimant in fact had. Rather, it was the ALJ's function to first determine what medical restrictions claimant was under and how they affected his residual functional capacity, and then to determine whether the vocational expert had identified a significant number of jobs in a relevant market given these restrictions."))].

In reply, Plaintiff argues that because the ALJ found that Plaintiff had documented severe mental impairments, Plaintiff was entitled to have these considered by the VE, yet the existence of Plaintiff's mental impairments and the accompanying

62

severe mental symptoms were not presented to the VE in the ALJ's hypothetical. [Doc. 13 at 2-3; *see also id.* at 3 (citing *Shumaker v. Astrue*, 657 F. Supp. 2d 1178, 1184 (D. Mont. 2009) ("When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record." (quoting *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (*per curiam*)))].

As the Eleventh Circuit has stated,

> In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.  *Vega v. Comm. of Social Security*, 265 F.3d 1214, 1220 (11th Cir. 2001).  Importantly, the ALJ is not required to include findings in the hypothetical that the ALJ has found to be unsupported.  *Crawford v. Comm. of Social Security*, 363 F.3d 1155, 1161 (11th Cir. 2004).  Thus, the hypothetical need only include limitations supported by the record.  *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).

*Gordon v. Astrue*, 249 Fed. Appx. 810, 812-13 (11th Cir. Oct. 4, 2007).

The Court finds that the adopted RFC did not sufficiently address Plaintiff's mental impairments, and therefore the hypothetical posed to the VE was also insufficient.  In *Winschel*, the ALJ had determined at step two that the claimant's mental impairments caused a moderate limitation in maintaining concentration, persistence and pace, but did not indicate that medical evidence suggested his ability

to work was unaffected by this limitation, nor did he otherwise implicitly account for

the limitation in the hypothetical to the VE.[30]  On appeal, the Eleventh Circuit held that

> the ALJ should have explicitly included the limitation in his hypothetical question to the vocational expert.
>
> Because the ALJ asked the vocational expert a hypothetical question that failed to include or otherwise implicitly account for all of Winschel's impairments, the vocational expert's testimony is not "substantial evidence" and cannot support the ALJ's conclusion that Winschel could perform significant numbers of jobs in the national economy. Accordingly, we reverse.  On remand, the ALJ must pose a hypothetical question to the vocational expert that specifically accounts for Winschel's moderate limitation in maintaining concentration, persistence, and pace.

*Winschel*, 631 F.3d at 1181.  The *Winschel* Court recognized that some courts reject the

argument that an ALJ generally accounts for a claimant's limitations in concentration,

persistence and pace when restricting the hypothetical question to simple, routine tasks

or unskilled work.  *Id.* at 1180 (citing *Stewart v. Astrue*, 561 F.3d 679, 684-85

(7th Cir. 2009); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); and *Newton v.*

*Chater*, 92 F.3d 688, 695 (8th Cir. 1996)).  The court also observed that where medical

evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled

---

[30]      In the opinion below, the district court noted that the ALJ limited the claimant in the hypothetical to unskilled or semi-skilled work. *Winschel v. Comm'r of Soc. Sec.*, No. 6:08-cv-1750-Orl-DAB, 2009 WL 4885019, *5 (M.D. Fla. Dec. 14, 2009), *rev'd* 631 F.3d 1176 (11th Cir. 2011).

AO 72A
(Rev.8/8
2)

work despite limitations in concentration, persistence, and pace, other courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations. *Winschel*, *id.* (citations omitted). Finally, the court noted that other circuits have held that hypothetical questions adequately account for a claimant's limitations in concentration, persistence, and pace when the questions otherwise implicitly account for these limitations. *Id.* at 1180-81 (citations omitted).

From this discussion, it appears that the Eleventh Circuit has chartered a middle ground between the positions taken by the Seventh Circuit in *Stewart*, where mental limitations must be expressly included in the hypothetical, and those other circuits where the limitations are impliedly included.

However, it is clear that the hypothetical to the VE in the present case falls short of even those cases which require only an implicit inclusion. Like *Stewart*, limiting a claimant to simple tasks inadequately conveys Plaintiff's limitations in concentration, persistence and pace. And, unlike those cases cited by the *Winschel* Court which approved implicit inclusion, *see Winschel*, *id.* (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 288 (6th Cir. 2009) (concluding that the ALJ's reference to a moderate limitation in maintaining "attention and concentration" sufficiently represented the claimant's limitations in concentration, persistence, and pace), and *Thomas v. Barnhart*,

AO 72A
(Rev.8/8
2)

278 F.3d 947, 956 (9th Cir. 2002) (concluding that the hypothetical question adequately incorporated the claimant's limitations in concentration, persistence, and pace when the ALJ instructed the vocational expert to credit fully medical testimony related to those limitations), the ALJ's hypothetical in this case did not reference the medical records or the limitations in concentration, persistence and pace caused by Plaintiff's mental impairments.

Because, as previously noted, the ALJ's RFC determination did not properly accommodate limitations from all of Plaintiff's impairments, the ALJ erred. Consequently, the VE necessarily could not have properly assessed whether there existed significant jobs in the relevant market for the hypothetical individual with Plaintiff's limitations. *See* SSR 96-8p at *7 (listing narrative discussion requirements for the RFC assessment)  As a result, the ALJ's decision was not based on substantial evidence and must be reversed. *See Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985) ("[W]e cannot assume that the vocational expert would have answered in a similar manner had the ALJ instructed him to consider all of the appellant's severe impairments.  Thus, we must conclude that the Secretary failed to meet its burden of showing that the appellant could perform other gainful employment in the economy. We hold that the Secretary's decision was not supported by substantial evidence.");

AO 72A
(Rev.8/8
2)

*accord Manzo v. Comm'r of Soc. Sec.*, No. 10-12334, 2011 WL 69507, *2 (11th Cir.

Jan. 7, 2011).  As a result, Plaintiff's claim must be remanded to the Commissioner for

further consideration.

## VIII.  CONCLUSION

For the aforementioned reasons, the Court **REVERSES** the final decision of the

Commissioner and **REMANDS** the case for further proceedings consistent with this

opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 29th day of March, 2011.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

67